IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

C.R. DANIELS, INC., AND CASTO
& HARRIS, INC.,

    *Plaintiffs,*

    v.                             Civil Action No.: ELH-11-01624

NAZTEC       INTERNATIONAL
GROUP, LLC,

    *Defendant.*

## MEMORANDUM OPINION

Plaintiffs C.R. Daniels, Inc. ("C.R. Daniels") and Casto & Harris, Inc. ("Casto & Harris"), filed suit against defendant Naztec International Group, LLC ("Naztec"), alleging patent infringement with respect to a particular type of voting booth, in violation of 35 U.S.C. § 271 *et seq. See* "Complaint For Injunctive Relief And Damages And Demand For Jury Trial" ("Complaint," ECF 1).[1]  Pursuant to FED. R. CIV. P. 12(b)(2), Naztec has filed "Defendant's Motion To Dismiss For Lack Of Personal Jurisdiction" ("Motion," ECF 11), as well as a supporting memorandum ("Memo," ECF 12).[2]  Plaintiffs oppose the Motion. *See* "Plaintiffs' Opposition To Defendant's Motion To Dismiss Or, In The Alternative, Request For

---

[1] Plaintiffs assert that this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which governs "federal question" jurisdiction; 28 U.S.C. § 1338(a), which confers on the district courts original jurisdiction over civil actions arising under any Act of Congress relating to patents; and 28 U.S.C. § 1332(a)(1), which governs diversity jurisdiction. Complaint at 2 ¶¶ 4-6.

[2] Defendant has appended numerous exhibits to its Memo, including the Declaration of Mohamed "Sal" Pazhoor, President of Naztec ("Exhibit B"); pamphlets describing the Smartpoll voting booth, the product at issue in this case ("Exhibit B1" and "Exhibit B2"); an "Analysis of the FY 2012 Maryland Executive Budget" ("Exhibit B3"); a 2010 "Maryland Voting Systems Study" ("Exhibit B4"); the Declaration of Sarfraz Pazhoor, Project Manager for Naztec ("Exhibit C"); photographs of voting booths ("Exhibit C1"); and pamphlets describing the Smartpoll voting booth ("Exhibit C2" and "Exhibit C3").

Jurisdictional Discovery" ("Opposition," ECF 13).[3]   In reply, defendant filed "Defendant's Reply In Support Of Its Motion To Dismiss For Lack Of Personal Jurisdiction" ("Reply," ECF 16).

As the matter has been fully briefed, the Court rules now pursuant to Local Rule 105.6, no hearing being necessary.

### Factual and Procedural Background[4]

C.R. Daniels, a Maryland corporation with its principal place of business in Ellicott City, Maryland, is a manufacturing company that produces, among other things, voting booths, utility carts, and other accessories for the election supply industry.   Complaint at 1 ¶ 1.   Casto & Harris, a West Virginia corporation with its principal place of business in Spencer, West Virginia, is a distributor of election supplies throughout the United States, including products made by C.R. Daniels.   *Id.* at 2 ¶ 2.   Naztec, a Florida corporation with its principal place of business in West Palm Beach, Florida, manufactures and sells voting booths for the election supply industry.   *Id.* at 2 ¶ 3.

In 2008, Gary Abel, President of C.R. Daniels, and Joe Wilson, of Casto & Harris, designed a wheeled voting booth that nests with other like voting booths and, when nested together, can be transported in groups.   *Id.* 3 at ¶ 13.   Unlike conventional voting booths, which are "cumbersome to store and transport," Opposition at 2, and must be assembled and

---

[3] Plaintiffs have appended numerous exhibits to their Opposition.  *See* Affidavit of Gary V. Abel, President of C.R. Daniels ("Exhibit 1"); "Vendor Information" brochure from the Maryland Association of Election Officials 2011 Annual Meeting ("Exhibit 2"); and a map showing the location of vendors' booths at the conference held in Ocean City, Maryland ("Exhibit 3").

[4] Most of the facts are undisputed.  In any event, the Court construes the facts alleged in the Complaint in the light most favorable to plaintiffs, as the parties opposing the motion.  *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir. 1993).

disassembled in order to be transported and stored, Complaint at 3 ¶ 11, the booth designed by Abel and Wilson requires no assembly and can be stored compactly. *Id.* at 3 ¶¶ 12-13. Because polling places tend to be temporary facilities set up in schools, churches, and other permanent structures, multiple voting booths must be brought in during elections. *Id.* at 3 ¶ 9. Consequently, ease of transport and removal, simplicity of setup, durability and compactness of storage are crucial design concerns for voting booths. *Id.* at 3 ¶ 10.

On March 9, 2009, Abel and Wilson filed a U.S. provisional patent for the voting booth in issue. *Id.* at 4 ¶ 14. That application eventually matured into United States Utility Patent 7,895,954 (the "954 patent").[5] *Id.* The 954 patent, entitled "Portable, nesting voting booth," was issued on March 1, 2011. *Id.* Abel and Wilson subsequently obtained five design patents covering the ornamental appearance of the portable nesting voting booth: D622,975 (the "975 patent"); D603,184 (the "184 patent"); D603,621 (the "621 patent"); D616,217 (the "217 patent"); and D603,183 (the "183 patent"). *Id.* at 4 ¶¶ 15, 16.[6] Abel and Wilson subsequently assigned their joint ownership interests in these patents to plaintiffs. *Id.* at 4 ¶ 17.

Since mid 2009, C.R. Daniels has manufactured, and Casto & Harris has marketed, the portable nesting voting booth, under the "ReadyVote[TM]" brand name ("ReadyVote"). *Id.* at 4 ¶ 18. According to plaintiffs, the Ready Vote has developed significant market share. *Id.*

Naztec has been manufacturing and selling a voting booth under the "Smartpoll[TM]" brand name ("Smartpoll"). *Id.* at 5 ¶ 19. According to plaintiffs, the Smartpoll employs a design that infringes upon the patents they hold relating to the ReadyVote booth, namely the

---

[5] Plaintiffs appended a copy of the 954 patent to their Complaint as "Exhibit A."

[6] Plaintiffs appended to their Complaint copies of the 975 patent, the 184 patent, the 621 patent, the 217 patent, and the 183 patent, as "Exhibits B, C, D, E, and F," respectively.

3

954 patent, the 975 patent, the 184 patent, the 621 patent, the 217 patent and the 183 patent. *Id.*[7] Plaintiffs allege Naztec has infringed upon plaintiffs' patents by distributing the Smartpoll throughout the United States, and by continuing their acts of infringement after plaintiffs provided notice of the patent.[8] *Id.* at 5 ¶¶ 20-21.

Defendant admits its "recent participation in a conference in Ocean City, [Maryland] at which it displayed several of its voting system products, including the accused voting booth." Memo at 2.[9] But, it also contends: "It has not otherwise manufactured, used, sold or offered to sell the booth within the state. Naztec maintains no presence in Maryland." *Id.*

In particular, Naztec attended the Annual Meeting of the Maryland Association of Election Officials, held in conjunction with the State Board of Elections Biennial Meeting, in Ocean City, Maryland, from June 12 through June 15 of 2011 (the "Conference"). Opposition at 3. Commercial vendors were required to pay a $750 entry fee, which included space on the vendor floor. *Id.* at 3-4 (citing Opposition Exh. 2).

Plaintiffs emphasize the importance of such conferences to their business, asserting: "One of the primary means by which the Plaintiffs market the ReadyVote booths is through conferences, conventions and trade shows geared towards state and local elections officials." Opposition at 3. Plaintiffs explain that this is "because there is no market for voting booths outside of state and local governments." *Id.* Citing the affidavit of Gary Abel, who attended the

---

[7] For the purpose of this Motion, I must assume that the Smartpoll is, in fact, an infringing product. *See Mylan Laboratories, Inc.*, 2 F.3d 56.

[8] Plaintiffs claim they notified Naztec of its alleged infringement by way of a letter from counsel sent on May 13, 2011. Opposition at 4.

[9] Defendant also notes that it "utilizes an independent sales representative based in Minnesota[, who] recently advised that it may have made a single WebEx webinar presentation – concerning a Naztec product which is not implicated in this litigation – in January 2010 to an audience that included Maryland election officials, but that it cannot confirm whether the presentation was made." Memo at 6 (citation omitted).

Conference, Opposition Exh. 1, plaintiffs maintain that "it is uncommon for the Plaintiffs to make an actual sale of voting booths at a conference.  Rather, because of governmental or municipal purchasing cycles, there is often a lag time of anywhere from a couple of weeks up to three (3) years before a client contacts the Plaintiffs about purchasing voting booths after seeing them at a conference."  Opposition at 3.  Again citing Abel's affidavit, plaintiffs assert that "representatives rarely talk about prices with potential customers at the conferences.  Rather, the pricing discussion occurs later, after the buyer has secured approval for the purchase and knows how much can be spent and how many booths are needed."  *Id.*

Abel avers in his Affidavit that "Naztec had the largest marketing display at the Ocean City Conference."  Opposition Exh. 1 ¶ 11.  According to Abel, "Naztec display[ed] three different voting booths, including two nesting voting booth[s]."  *Id.* ¶ 12.  Referring to the vendor floor plan, Opposition Exh. 3, plaintiffs note that Naztec's display "was approximately three (3) times as big as any other vendor at the conference."  Opposition at 5.

Further, Abel avers, Opposition Exh. 1 ¶ 12-13:

[I]n direct competition with C.R. Daniels, I observed Naztec demonstrating their nesting voting booth to some of the same Maryland state and county employees with whom I had spoken [to market our nesting voting booths at the Conference].

Over the course of the Conference, I personally saw Naztec representatives use the infringing voting booths[, nesting them together,] to attract potential customers to stop at their booth.  I also observed them using the booth by demonstrating the nesting feature . . . not only during each day of the conference as a demonstration, but also at the end of each day and at the conclusion of the conference as a means of consolidating them for storage and transport.

## Standard of Review

In the Complaint, at 2 ¶ 7, plaintiffs assert:

[Naztec] has established minimum contacts with the forum by purposely availing itself of the laws and benefits of the forum, and the exercise of jurisdiction over

the Naztec [sic] would not offend traditional notions of fair play and substantial justice . . . [as] . . . Naztec has voluntarily conducted business in this judicial district by using, selling and/or offering infringing voting booths for sale in this district.

In patent infringement cases, personal jurisdiction is governed by the law of the Federal Circuit. *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed. Cir. 1994). When a motion to dismiss is made under FED. R. CIV. P. 12(b)(2), for lack of personal jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction over the defendant. *Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.*, 552 F.3d 1324 (Fed. Cir. 2008). In this District, it has been held that the pleading standards set forth by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937 (2009), apply to allegations of personal jurisdiction in the same manner as they govern other complaints, although the Federal Circuit has not ruled on the issue of the applicability of *Twombley*. *See Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790 (D. Md. 2011) (citing similar holdings from Sixth Circuit, Tenth Circuit, and Eastern District of New York). In the context of a dispute as to personal jurisdiction, *Twombley* and *Iqbal* would require a plaintiff to establish a claim of personal jurisdiction "that is plausible on its face." 550 U.S. at 570. This requires "more than labels and conclusions." *Id.* at 555.

Neither discovery nor an evidentiary hearing are necessarily required to resolve a motion under Rule 12(b)(2). *See generally* 5B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1351, at 274-313 (3d ed. 2004, 2010 Supp.). Rather, the district court may address the question of personal jurisdiction as a preliminary matter, ruling on the basis of pleadings, affidavits, and other written materials. *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.,* 566 F.3d 1012, 1017 (Fed. Cir. 2009). In that circumstance, the plaintiff need only make a prima facie showing that the defendant is subject to personal jurisdiction. *Id.* However, the plaintiff must eventually

prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing. *Bledsoe v. Merit Systems Protection Bd.*, No. 2011–3054, 2011 WL 4537804, at *3 (Fed. Cir. Oct. 03, 2011); *Campbell Pet Co. v. Miale*, 542 F.3d 879, 889 (Fed. Cir. 2008); *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001).

A federal district court has personal jurisdiction over a defendant if two requirements are satisfied. *Patent Rights Protection Group, LLC v. Video Gaming Technologies, Inc.*, 603 F.3d 1364, 1368 (Fed. Cir. 2010). "First, the defendant must be amenable to service of process." *Id.* (*citing Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)). "Second, exercising jurisdiction over the defendant must comport with due process." *Id.* at 1369 (*citing Avocent Huntsville Corp.*, 552 F.3d at 1329).

Determining whether a defendant is "amenable to service of process" requires an examination of the forum state's long-arm statute. *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir. 1998). Citing *Burger King v. Rudzewicz,* 471 U.S. 462, 471-78 (1985), the Federal Circuit said in *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 857 (Fed. Cir. 1999): "To exercise personal jurisdiction over an out-of-state party, a court must determine whether personal jurisdiction is (1) permitted by the forum state's long-arm statute, and (2) consistent with due process."

Maryland's long-arm statute provides, in part, that a Maryland court has personal jurisdiction over a defendant if that defendant "[c]auses tortious injury in the State by an act or omission in the State" or "[t]ransacts any business or performs any character of work or service in the State." Md. Code (2006 Repl. Vol., 2011 Supp.), §§ 6-103(b)(3) and (1) of the Courts & Judicial Proceedings Article ("C.J."). As to C.J. § 6-103(b)(3), it is well settled that "[patent] [i]nfringement, whether direct or contributory, is essentially a tort, and implies invasion of some

right of the patentee." *Carbice Corp. of Am. v. American Patents Dev. Corp.*, 283 U.S. 27, 33 (1931); *see also Orthokinetics, Inc. v. Safety Travel Chairs Inc.*, 806 F.2d 1565, 1579 (Fed.Cir.1986) ("Patent infringement is a tort . . .."). As to C.J. § 6-103(b)(1), the Maryland Court of Appeals has construed the Maryland long-arm statute as authorizing the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause. *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006). When "personal jurisdiction . . . reaches to the limits of due process, . . . the inquiry . . . is whether exercise of personal jurisdiction . . . is consistent with due process." *Amana Refrigeration,* 172 F.3d at 857. *See also Inamed Corp. v. Kuzmak,* 249 F.3d 1356, 1360 (Fed. Cir. 2001) (stating that when a state's "long-arm statute is coextensive with the limits of due process, [there is] a single inquiry: whether jurisdiction comports with due process.").

In order to exercise personal jurisdiction, due process requires that the non-resident defendant have "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (citation omitted). "Minimum contacts" are established if the defendant "purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

To establish general personal jurisdiction over a defendant, a plaintiff must show that the defendant has "'continuous and systematic' contacts with the forum state, which "confers personal jurisdiction even when the cause of action has no relationship with those contacts." *Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1200 (Fed. Cir. 2003) (citation omitted). But, even "[w]here a defendant is not subject to general jurisdiction in the forum state, a district

court may nonetheless exercise specific [personal] jurisdiction over the defendant . . . ."
*Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1360-61
(Fed. Cir. 2006). "Specific personal jurisdiction must be based on activities that 'arise[ ] out of'
or 'relate [ ] to' the cause of action and can exist even if the defendant's contacts are 'isolated
and sporadic.'" *Id.* (citation omitted).

The Federal Circuit "has adopted a three-factor test embodying the Supreme Court's
jurisprudence on specific personal jurisdiction." *Electronics For Imaging, Inc. v. Coyle*, 340
F.3d 1344, 1350 (Fed. Cir. 2003). They are as follows:

> (1) whether the defendant "purposefully directed" its activities at residents of the
> forum; (2) whether the claim "arises out of or relates to" the defendant's activities
> with the forum; and (3) whether assertion of personal jurisdiction is "reasonable
> and fair." . . . The first two factors correspond with the "minimum contacts" prong
> of the *International Shoe* analysis, and the third factor corresponds with the "fair
> play and substantial justice" prong of the analysis.

*Inamed,* 249 F.3d at 1360 (quoting *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995)).

## Contentions

Defendant urges the Court to dismiss this action for lack of personal jurisdiction.
Claiming that its contacts with Maryland were "sporadic" and "insubstantial," Naztec maintains
that its contacts were insufficient to establish either general or specific personal jurisdiction over
Naztec. As to general jurisdiction, defendant posits, Memo at 6-7 (citations omitted):

> Naztec does not have continuous and systematic general business contacts
> with the State of Maryland. In fact, it maintains no presence in the forum at all.
> It maintains no offices or regular and established places of business in the state. It
> has no employees, agents or distributors in the state. It does not own property or
> anything of value in the state. It is not registered to do business in Maryland, and
> conducts no business in the state. It has no subsidiary or affiliated companies in
> Maryland. It maintains no bank accounts within the state. It has not placed
> advertisements in local newspapers, magazines or television stations, nor has it
> advertised through telemarketing, in Maryland. . . .

. . . Naztec has not . . . conducted any directed internet advertising, nor has it conducted an[y] mailing campaigns, focused on Maryland residents.  Naztec's websites are not directed to Maryland residents, but rather are generally available to anyone in the United States having internet access.

With respect to the nature of Naztec's business, which is the production, marketing and sale of voting booths, Naztec has not had any participation or involvement with any request for proposal (RFP) or other bidding requests issued from any state or municipal government agency in Maryland as part of a procurement process.

Defendant also disputes specific personal jurisdiction.  Naztec concedes that it "participated as an exhibiting vendor" at the Conference from June 12-15, 2011.  Memo at 7.  Naztec also concedes that, at the Conference, it "displayed" its "voting booth products," including the Smartpoll voting booth.  *Id.*  Indeed, Naztec characterizes its attendance at the Conference as its "most significant connection to the State of Maryland."  *Id.*  But, Naztec claims that it merely "attended the conference for informational and networking purposes."  *Id.* (citing Memo Exh. B ¶ 19; Memo Exh. C ¶ 21).

Naztec contends that it "did not use or sell" any of its products at the Conference.  *Id.*  It states: "It did not offer to sell the accused voting booth, and only provided specific pricing for other voting system products. . . ."  *Id.*  Further, Naztec contends that "the attendees at the conference were in no position to purchase or request bidding for voting system products."  *Id.*  Citing the affidavits of Naztec President Sal Pazhoor (Exh. B ¶ 28) and Project Manager Sarfraz Pazhoor (Exh. C ¶ 12), Naztec asserts that the attendees did not hold "purchasing or decision-making power to acquire voting booths, because only the State Board of Elections or the Maryland Department of Legislative Services would have such authority."  Memo at 11.  Moreover, Naztec insists that defendant "and perhaps everyone else in the election industry attending the conference . . . knew full well that there [would] not be any sales of voting booths

in Maryland until at least 2013 because of the state's budget issues."  Memo at 12 (citing Exh. B ¶¶ 24-28; Exh. C ¶ 14).

Addressing the three prongs articulated in *Inamed*, 249 F.3d at 1360, and *Akro Corp.*, 45 F.3d at 1545, defendant maintains that the facts described above do not give rise to specific personal jurisdiction over Naztec.  Memo at 8.

As to the first prong, defendant denies that it "purposefully directed" its activities at Maryland residents, as it has "no established distributors in Maryland," and the only contact it had with Maryland were the "single web presentation by an independent sales representative for an unrelated product" and its attendance at the Conference.  Memo at 8-9.  With regard to the Conference, defendant maintains that it "merely displayed the accused voting booth, and otherwise did not use, sell or offer to sell the booth at the conference [and] did not make specific pricing for the booth available to attendees."  *Id.* at 9.  Thus, Naztec claims it had only "isolated activity directed toward Maryland."  *Id.* at 8.

With respect to the second prong, Naztec disputes that the claim at issue "arises out of or relates to" defendant's activities in Maryland.  Defendant recognizes that, pursuant to 35 U.S.C. § 271(a), "[p]atent infringement occurs when one makes, uses, sells or offers to sell a patented invention without the patent owner's consent."  *Id.* at 9.  But, argues defendant: "It is clear that Naztec committed none of these acts, but rather merely displayed the accused voting booth at the conference," *id.*, and "made available a single-page brochure about the product."  *Id.* at 10.

Noting that it did not sell the product or "provide any definitive pricing terms . . . .," Naztec observes that "it would have been impossible for Naztec to initiate an actual transaction at the conference to sell the booth in Maryland," because the attendees lacked the "decision-making process to acquire voting booths. . . ."  *Id.* at 11.  Indeed, argues Naztec, "as early as

11

February 2011 Naztec–and perhaps everyone else in the election industry attending the conference – knew full well that there will not be any sales of voting booths in Maryland until at least 2013 because of the state's budget issues." *Id.* at 12.  Instead, Naztec "used the conference as an opportunity to network and introduce itself to officials for future consideration."  *Id.* Further, Naztec asserts:  "Naztec has not *sold* the accused voting booth in Maryland. It had no sales in the state prior to the conference. . . .  It did not sell the booth at the conference, and has not sold the booth in Maryland since the conference concluded.  No orders have been received or offered for the sale of the accused voting booth in Maryland, either at the conference or at any time prior or subsequent thereto" (emphasis in original). *Id.* at 13.

With respect to the third prong, defendant claims that the assertion of personal jurisdiction in this case "would be "unreasonable and unfair." *Id*.  Naztec explains, *id*. at 13-14:

> Naztec's contacts with Maryland to date have been *less than* minimal, consisting entirely of its attendance at one conference in Ocean City.  While attending the conference, Naztec . . . committed no acts from which the Plaintiffs' patent infringement claim could arise or relate. . . . [T]here is no connection between the Plaintiffs' infringement action, Naztec and the State of Maryland.  Rather, the only apparent connection to Maryland is that it is the home state of one of the Plaintiffs, C.R. Daniels, Inc.

In their Opposition, plaintiffs do not directly dispute Naztec's claim that the Court lacks general personal jurisdiction.  In a footnote, they state: "It is unclear at this juncture whether this Court can maintain general jurisdiction over Naztec." Opposition at 7 n. 3.[10]

As to specific personal jurisdiction, plaintiffs address each of the three prongs articulated in *Inamed* and *Akro Corp*.

---

[10] Plaintiffs assert that, "before the Court rules that it does not have general personal jurisdiction over Naztec, the Plaintiffs should be entitled to discovery on the true nature and extent of Naztec's contacts with Maryland."  Opposition at 7 n. 3.

With respect to the first prong, plaintiffs insist that Naztec "purposefully directed" its activities at Maryland. In support of this contention, they cite Naztec's attendance at the Conference, paying "a minimum of . . . $700" to participate and maintaining "the largest display of any of the vendors at the Conference," in an effort to compete for the business of the attendees, who "were employees of state and local governments in Maryland . . . ." *Id*. at 8. In this regard, plaintiffs observe that "[o]ne of the primary means" by which voting booths are marketed is through "conferences, conventions and trade shows geared towards state and local elections officials," because "there is no market for voting booths outside of state and local governments." *Id*. at 3. They add that "the bulk of the Plaintiffs' sales of voting booths are a direct result of exposure at state or regional elections conferences." *Id*.

In regard to the second prong, plaintiffs insist that their claim "arises out of or relates to" Naztec's activities at the Conference. In their view, defendant committed patent infringement in Maryland "by displaying the infringing booths in its Webinar and at the Ocean City Conference," *id*. at 12, and by "using" the Smartpoll booths at the Conference for their "intended purposes," i.e., "nesting the voting booths together, both in demonstration to Conference attendees and to store and transport the booths at the beginning and end of the Conference. . . ." *Id*. at 9.

Plaintiffs also contend that defendant committed patent infringement in Maryland by offering to sell the infringing booths at the Conference. In this regard, plaintiffs reject defendant's argument that it did not offer the booths for sale merely because it never discussed prices with the attendees; none of the attendees had authority to purchase the booths at the Conference; and the Maryland budget was so constrained that voting booths could not be purchased for two to three years. *Id*. at 11. Plaintiffs point out that defendant has admitted "that

its representatives discussed 'indicative pricing' as well as the price for which the infringing booths had recently been sold to the City of New York," and that "it is uncommon to actually discuss pricing with attendees at a conference when marketing these types of voting booths." *Id.* [11]  In addition, plaintiffs observe that "it is uncommon to make actual sales at a conference." *Id.* at 12.  Instead, "the point is to market the products at the conference and await a call from interested purchasers following the conference."  *Id.*[12]  They also describe as "misleading" Naztec's "argument that there would be no funding for voting equipment for several years," explaining that "funding for voting booths [may] open up prior to 2014."  *Id.*

Plaintiffs also assert that, for the purpose of establishing infringement in Maryland, they need only show that defendant "'exposed for sale' an allegedly infringing article in the State of Maryland," which was accomplished when defendant displayed the booths at the Conference. *Id.* at 13.  Noting that they own not only "a utility patent in the nesting voting booths, but also . . . five . . . design patents . . . .", *id.* at 12, plaintiffs assert that the infringement of design patents is covered by both 35 U.S.C. § 271, discussed *supra,* pertaining to utility patents, and 35 U.S.C. § 289, which is specific to design patents and states, in relevant part:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or *exposes for sale any article of manufacture to which such design or colorable imitation has been applied* shall be liable to the owner to the extent of his total profit . . . .  (Emphasis added.)

---

[11]  Plaintiffs assert that "the pricing discussion occurs later, after the buyer has secured approval for the purchase and knows how much can be spent and how many booths are needed."  Opposition at 3.

[12]  In fact, plaintiffs note that "because of governmental or municipal purchasing cycles, there is often a lag time of anywhere from a couple of weeks up to three (3) years before a client contacts the Plaintiffs about purchasing voting booths after seeing them at a conference." Opposition at 3.

In addition, plaintiffs contend that, even if Naztec's conduct at the Conference did not constitute an "offer to sell," "Federal Circuit precedent makes clear that [defendant's] activities were sufficiently related to the Plaintiffs' claims for infringement that the Court can and should exercise personal jurisdiction over Naztec." Opposition at 13. In their view, a "close nexus between Naztec's acts and the Plaintiffs' claims" is sufficient to establish that their claims "arise out of or relate to" Naztec's activities at the Conference. *Id.* at 14.

Finally, with respect to the third prong, plaintiffs contend that, according to Federal Circuit case law, "[t]he assertion of personal jurisdiction over Naztec in this matter would be "reasonable and fair.'" *Id.* They elaborate: "[S]ince Naztec has demonstrated its ability to send two representatives and several samples of its voting booths to Maryland for a four day conference, it would not be unfair or unreasonable for this Court to exercise personal jurisdiction over it." *Id.* at 15.

## Discussion

Defendant denies "continuous and systematic" contact with Maryland so as to justify this Court's assertion of general personal jurisdiction over defendant. Although plaintiffs seem to concede that, on the face of the submissions, this Court lacks general jurisdiction over Naztec, they have offered evidence of defendant's attendance at the Conference and the Webinar, in support of their claim for specific personal jurisdiction.

It appears that defendant has had only "sporadic and insubstantial contacts with the forum state," and its contacts are not sufficient to establish general personal jurisdiction. *Campbell Pet Co.*, 542 F.3d 879 (declining to assert general jurisdiction over defendant despite her having made twelve sales totaling almost $14,000 and attended a convention in the forum state). *See also Autogenomics, Inc.*, 566 F.3d at 1018 (declining to assert general jurisdiction

15

over defendant, because attendance at "four conferences over five years constitute[s] only sporadic and insubstantial contacts").   But, under the three-factor test articulated in both *Inamed*, 249 F.3d 1356, and *Akro Corp.*, 45 F.3d 1541, plaintiffs have established specific personal jurisdiction.

As noted, defendant concedes that it "attended the [C]onference for informational and networking purposes." Memo at 9.  It sought to "introduce itself" to members of the Maryland Association of Election Officials "for future consideration."   *Id.* at 12.   In attending the Conference, defendant obviously hoped to make connections that would eventually lead to sales of its products in Maryland, including the allegedly infringing booths.   Clearly, defendant "purposely directed" its activities at residents of Maryland.

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297-98 (Fed. Cir. 2009), provides guidance.  There, in finding specific personal jurisdiction, the Federal Circuit determined that the defendant had purposefully directed its activities at the forum by displaying allegedly infringing products at a trade show in order to bolster its "sales effort," even though no residents of the forum could actually purchase the products due to a lack of FDA approval.[13]

I am also satisfied that plaintiffs' claim "arises out of or relates to" defendant's activities in the forum.  As indicated, 35 U.S.C. § 271(a) states that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the

---

[13] In *Synthes,* the defendant was a foreign corporation, and the forum was the United States.  However, the analysis the court performed was identical to that which is performed with regard to a domestic corporation's contacts with a given forum state.  The contacts that defendant had with the United States were essentially limited to its appearance at a trade show, in a scenario substantially similar to the case at bar.

patent."  As the claim at issue here is one of alleged patent infringement, the claim would be one that "arises out of or relates to" defendant's activities in the forum, if defendant made, used, sold, or offered to sell an infringing product in Maryland.

As defendant notes, "It appears undisputed that Naztec has not manufactured the accused voting booth in Maryland."  Memo at 10.  Defendant also asserts, and plaintiffs do not dispute, that Naztec

> had no sales in the state prior to the conference.  It did not sell the booth at the conference [in June 2011], and has not sold the booth in Maryland since the conference concluded.  No orders have been received or offered for the sale of the accused voting booth in Maryland, either at the conference or at any time prior or subsequent thereto.

*Id.* at 13 (citations omitted).  In my view, however, the evidence is sufficient to establish that defendant did use and offer to sell the allegedly infringing product in Maryland.[14]

"In terms of the infringing act of 'use,' courts have interpreted the term 'use' broadly." *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1316 (Fed. Cir. 2005).  "The ordinary meaning of 'use' is to 'put into action or service.'"  *Id.* at 1317 (citing *Webster's Third New International Dictionary* 2523 (1993)).  However, "[t]he inquiry as to what constitutes a 'use' of a patented item is highly case-specific."  *Medical Solutions, Inc. v. C Change Surgical, LLC*, 541 F.3d 1136, 1141 (Fed. Cir. 2008).

*Medical Systems* involved patented technology pertaining to "systems for warming and controlling the temperature of medical and surgical items."  *Id.*  The alleged infringer attended a trade show, where it "displayed a prototype of its product, staffed its booth with representatives, and made available brochures about the product."  *Id.*  But, the only "active[] demonstrate[ion]"

---

[14] Having so found, I need not resolve the dispute over whether 35 U.S.C. § 289, which applies specifically to design patents, "should [or should] not be taken as a definition of what constitutes infringement of a design patent," such that "displaying" the infringing product constitutes "expos[ing] for sale" and, consequently, infringement.  Reply at 6.

of the product at the trade show was of "how to take the basin off the device when the basin still had fluid in it," a use that did not go to the ultimate function of the product, nor the function for which it was patented. *Id.* The Federal Circuit determined that, "to qualify as an infringing use," plaintiff had to show "[m]uch more" than it had, "including that the device was used to heat medical items at the show." *Id*.

Notably, the court stated, *id.* at 1140:

Several courts addressing whether a defendant has "used" a patented invention have held that "the mere demonstration or display of an accused product, even in an obviously commercial atmosphere" is not an act of infringement for purposes of § 271(a).

Yet, contrary to defendant's suggestion, the court went on to state: "In this case we need not (and do not) decide whether the demonstration of a product at a trade show could ever be sufficient to establish an infringing use." *Id*. at 1141.

Defendant insists that the booths are only "used" within the meaning of the statute when they are used to record votes during an election. It asserts:

The accused product in this case is a voting booth. Not a stackable convention chair. Not a shopping cart. A voting booth is a device that when put into service enables a voter to prepare and cast his or her ballot with privacy, so as to protect the secrecy of the ballot. The booth is put to such use by state and municipal government officials during elections . . ..

Reply at 3. However, plaintiffs allege, and defendant does not dispute, that at the Conference "Naztec actually demonstrated how its infringing booths could nest together . . . ." Opposition at 9. According to plaintiffs, the nesting "is the prime function that distinguishes the booths from all others and enabled C.R. Daniels to obtain the '954 Patent." *Id.*

In the context and circumstances of this case, I reject defendant's cramped interpretation of the term "use," and its claim that the booths could not be used unless they were actually in service for the ultimate function of recording votes during an election. In my view, for

analytical purposes concerning the Motion, Naztec used the infringing voting booths by demonstrating a key feature of them at the Conference — the nesting ability — and by actually nesting the booths to store and transport them.

I am also satisfied that defendant "offered to sell" the allegedly infringing booths at the Conference. The Federal Circuit defines "§ 271(a)'s 'offer to sell' liability according to the norms of traditional contractual analysis." *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254-55 (Fed. Cir. 2000). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981) ("Restatement"). However, even if "a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." Restatement § 33.

In general, a price term is included in an offer of sale. But, a price term is not necessarily required. "Occasionally, those who offer or agree to employ others, or to buy goods, will make no statement as to the wages or price to be paid. In such a case, the law invokes a standard of reasonableness so that the fair value of the services or property is recoverable. The Uniform Commercial Code codifies such a rule . . .." 1 Williston on Contracts § 4:25 (4th ed.) (citing Uniform Commercial Code § 2-305, "Open Price Term," stating: "The parties if they so intend can conclude a contract for sale even though the price is not settled."). *See also* Restatement § 33, Comment "a" ("[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon."). And, "according to the norms of traditional

contractual analysis," "price quotations are ordinarily not interpreted as offers."  Restatement § 33, Comment "c" ("Preliminary Negotiations").

The Federal Circuit has indicated that a price term is necessary to constitute an "offer to sell" within the meaning of § 271.  *See, e.g., MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1376 (Fed. Cir. 2005) ("[T]he e-mails, while containing a description of the allegedly infringing wafers, do not contain any price terms. Accordingly, on their face, the e-mails cannot be construed as an 'offer' which [could be made] into a binding contract by simple acceptance.").  Yet, the Federal Circuit has also indicated a desire to retain a measure of flexibility.  In *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373 (Fed. Cir. 1998), the court determined that price quotation letters sent by the defendant to residents of the forum, which stated on their face that they were *not* offers, nonetheless constituted an "offer to sell" within the meaning of § 271(a).  In its view, "a description of the allegedly infringing merchandise and the price at which it can be purchased" were sufficient "substance" to find an offer to sell.  *Id.* at 1379.  The court reasoned: "[T]o treat [the letters] as anything other than offers to sell would be to exalt form over substance.  We have consistently held that such exaltation is not appropriate in the due process analysis."  *Id.*  Further, the court stressed: "One of the purposes of adding 'offer[ ] to sell' to § 271(a) was to prevent exactly the type of activity [defendant] has engaged in, *i.e.,* generating interest in a potential infringing product to the commercial detriment of the rightful patentee."  160 F.3d at 1379.

To be sure, defendant's conduct is clearly far from the typical "offer to sell."  The allegedly infringing products were not displayed with specific prices, Memo at 11, and no sale could have been consummated at the Conference.  *Id.* at 12.  Yet, the inquiry cannot end there. Due to the nature of the product, which is necessarily "customizable according to customer

specifications, Naztec does not have fixed pricing for the product to advertise." *Id.* at 11. Further, plaintiffs assert, and defendant does not dispute, that trade custom dictates that "it is uncommon to actually discuss pricing with attendees at a conference when marketing these types of voting booths," Opposition at 11, or to "make actual sales at a conference like the Ocean City Conference; rather, the point is to market the products at the conference and await a call from interested purchasers following the conference . . .." *Id.* at 12.   Moreover, Naztec discussed "indicative pricing" with attendees at the Conference, and "verbally advised attendees of sample pricing from a previous, unrelated contract executed with the Board of Elections for the City of New York."   Memo at Exh. C.   It also concedes that it "attended the [C]onference for informational and networking purposes," *id*. at 9, and to "introduce itself to [members of the Maryland Association of Election Officials] for future consideration."   *Id*. at 12.

Were the lack of definitive pricing or the prospect of an immediate sale dispositive, sellers of products that by their nature defy such pricing and are incapable of being purchased in a prototypical way, with one party "assent[ing] to" and thus "conclud[ing]" the transaction, Restatement § 24, would be out of reach for the purpose of specific personal jurisdiction, free to peddle their allegedly infringing wares in any forum without having made an "offer to sell."   35 U.S.C. § 271(a).   As the Federal Circuit has stated, "[o]ne of the purposes of adding 'offer[ ] to sell' to § 271(a) was to prevent exactly the type of activity [defendant] has engaged in, *i.e.,* generating interest in a potential infringing product to the commercial detriment of the rightful patentee."   *3D Systems, Inc.,* 160 F.3d at 1379.

In *Patent Rights Protection Group, LLC*, 603 F.3d 1364, the Federal Circuit determined that the district court erred in refusing to grant jurisdictional discovery as to the issue of personal jurisdiction.   In that case, the defendants had attended an industry trade show in the

forum, where they exhibited allegedly infringing products, but claimed to have attended "without a commercial purpose." *Id.* at 1372. The court stated, *id.*:

> To the extent that either [defendant] contends that they attended these trade shows without a commercial purpose, we consider this contention to strain credulity. It is simply unrealistic to contend that either [defendant], companies engaged in the business of selling gaming products, would exhibit its products at a gaming trade show in Las Vegas, Nevada, one of the world's larger gaming markets, without some prospect of commercial benefit.

Similarly, it "strain[s] credulity" to conclude that Naztec did not attend the Conference in order to "offer to sell" its allegedly infringing booths. Defendant's arguments about the lack of a specific price term and the inability to consummate an actual sale at the Conference are neither persuasive nor dispositive. These characteristics—individualized pricing and long latency periods before the consummation of sale—appear to be typical of the industry. Nevertheless, defendant did all that it could to "offer to sell" the infringing booths within the bounds of the industry in which it operates.

Having found that defendant's conduct amounted to "purposefully direct[ing] "its activities at residents of Maryland, the forum state, and that plaintiffs' claim "arises out of or relates to" the defendant's activities within the forum, I must next address the third prong of analysis, *i.e.*, whether the assertion of specific personal jurisdiction over defendant would be "reasonable and fair." Defendant has put forth only one argument in support of its contention that this Court's exercise of personal jurisdiction over Naztec would be "unfair and unreasonable"—that "Naztec's contacts with Maryland to date have been *less than* minimal." Memo at 13-14.

The following factors are relevant to the consideration of reasonableness:

> '[T]he burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of

controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.

*Burger King Corp.*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. 286, 292 (1980)).

Again, *Patent Rights* is instructive. In that case, in assessing reasonableness, the court stated, 603 F.3d at 1370 (citation omitted):

'[B]ecause modern transportation and communications have made it much less burdensome for a party sued to defend [itself]' outside its home state, defending this suit in Nevada is not prohibitively burdensome for either SPEC or VGT. Indeed, their admitted presence at numerous trade shows in Nevada indicates that, despite their arguments to the contrary, neither company faces a particularly onerous burden in defending itself in Nevada.

The same reasoning applies here. Maryland is the home state of plaintiff C.R. Daniels, and is substantially closer to West Virginia, the home state of plaintiff Casto & Harris. Clearly, Naztec was able to attend the Conference in Maryland. Further, "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King,* 471 U.S. at 474. "This interest extends to actions for patent infringement." *Patent Rights,* 603 F.3d at 1371 (citing *Beverly Hills Fan Co.*, 21 F.3d at 1568).

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction," as is the case here, "he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Defendant has not presented a "compelling case" that litigating this case in Maryland would be unreasonable. Although defendant claims that its contacts with Maryland

have been "minimal," its contacts were substantial enough to sustain jurisdiction in this case.[15] Accordingly, I find that it is "reasonable and fair" for this Court to exercise specific personal jurisdiction over defendant Naztec.

**Conclusion**

For the foregoing reasons, the Court will deny defendant Naztec International Group, LLC's motion to dismiss for lack of personal jurisdiction.  A separate Order consistent with this Memorandum Opinion follows.


Date:  December 2, 2011                                    _____/s/_____

Ellen Lipton Hollander
United States District Judge

---

[15] Defendant has not raised any other argument as to why litigating the case in Maryland would not comport with "fair play and substantial justice."