IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

C.R. DANIELS, INC.
AND CASTO & HARRIS, INC.,

    *Plaintiffs,*

    v.

    Civil Action No.: ELH-11-01624

NAZTEC INTERNATIONAL
GROUP, LLC,

    *Defendant.*

**MEMORANDUM OPINION**

Plaintiffs C.R. Daniels, Inc. ("C.R. Daniels") and Casto & Harris, Inc. ("Casto & Harris"), filed suit on June 13, 2011, against Naztec International Group, LLC ("Naztec"), defendant, alleging patent infringement with respect to a particular type of voting booth, in violation of 35 U.S.C. § 271 *et seq.* ("Complaint," ECF 1). They seek injunctive and declaratory relief as well as damages. *Id.* at 6. In its second motion to dismiss, Naztec argues lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) ("Motion," ECF 23).[1] It contends that plaintiffs "did not own the patents they have asserted when they filed their Complaint and therefore lack standing to proceed" ("Motion," ECF 23). *See also* "Defendant's Memorandum Of Points And Authorities In Support Of Its Motion To Dismiss Under Fed. R. Civ. R. [sic] 12(b)(1)" ("Motion Memo," ECF 23-1). Plaintiffs oppose the Motion ("Opposition," ECF 29), to which defendant has replied ("Reply," ECF 30).

As the matter has been fully briefed, the Court rules now pursuant to Local Rule 105.6, no hearing being necessary.

---

[1] Naztec filed an earlier "Motion To Dismiss For Lack Of Personal Jurisdiction" (ECF 11), arguing that defendant did not have sufficient contacts with Maryland to confer personal jurisdiction here. That motion was denied on December 2, 2011. ECF 17, 18.

## Factual Background[2]

C.R. Daniels, a Maryland corporation with its principal place of business in Maryland, is a manufacturing company that produces, among other things, voting booths, utility carts, and other accessories for the election supply industry. Complaint at 1 ¶ 1. Casto & Harris, a West Virginia corporation with its principal place of business in West Virginia, is a distributor of election supplies throughout the United States, including products made by C.R. Daniels. *Id.* at 2 ¶ 2. Naztec, a Florida corporation with its principal place of business in Florida, manufactures and sells voting booths for the election supply industry. *Id.* at 2 ¶ 3.

In 2008, Gary Abel, President of C.R. Daniels, and Joseph Wilson, of Casto & Harris, designed a wheeled voting booth that nests with other like voting booths and, when nested together, can be transported in groups. *Id.* 3 at ¶ 13. Unlike conventional voting booths, which must be assembled and disassembled in order to be transported and stored, *id.* at 3 ¶ 11, the booth designed by Abel and Wilson requires no assembly and can be stored compactly. *Id.* at 3 ¶¶ 12-13. Because polling places tend to be temporary facilities set up in schools, churches, and other permanent structures, multiple voting booths must be brought in during elections. *Id.* at 3 ¶ 9. Consequently, ease of transport and removal, simplicity of setup, durability, and compactness of storage are all crucial design concerns for voting booths. *Id.* at 3 ¶ 10.

On March 9, 2009, Abel and Wilson, individually, filed a "U.S. provisional patent application" for the voting booth in issue. *Id.* at 4 ¶ 14. That application eventually matured into United States Utility Patent 7,895,954 (the "954 patent"). *Id.* The 954 patent, entitled "Portable, nesting voting booth," was issued on March 1, 2011. *Id.* Abel and Wilson subsequently applied

---

[2] Most of the facts are undisputed. In any event, the Court construes the facts alleged in the Complaint in the light most favorable to plaintiffs, as the parties opposing the Motion. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir. 1993).

for and obtained five design patents covering the "ornamental appearance" of the portable nesting voting booth: D622,975 (the "975 patent"); D603,184 (the "184 patent"); D603,621 (the "621 patent"); D616,217 (the "217 patent"); and D603,183 (the "183 patent").  *Id.* at 4 ¶¶ 15-16.[3] In the Complaint, plaintiffs aver that Abel and Wilson subsequently assigned their joint ownership interests in these patents to the corporate plaintiffs, but do not specify when such an assignment occurred.  *Id.* at 4 ¶ 17.

Since mid 2009, C.R. Daniels has manufactured, and Casto & Harris has marketed, the portable nesting voting booth, under the "ReadyVote^TM" brand name ("ReadyVote").  *Id.* at 4 ¶ 18.  According to plaintiffs, the Ready Vote has developed significant market share.  *Id.*

Naztec has been manufacturing and selling a voting booth under the "Smartpoll^TM" brand name ("Smartpoll").  *Id.* at 5 ¶ 19.  According to plaintiffs, the Smartpoll employs a design that infringes upon the ReadyVote patents.  *Id.*  Therefore, as noted, plaintiffs filed suit against Naztec on June 13, 2011, alleging that Naztec has infringed upon plaintiffs' patents by distributing the Smartpoll throughout the United States, and by continuing their acts of infringement after plaintiffs provided notice of the ReadyVote patents.  *Id.* at 5 ¶¶ 20-21.

Naztec has moved to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  It contends that plaintiffs "did not own the patents they have asserted when they filed their Complaint and therefore lack standing to proceed."  *See* Motion at 1.

According to Naztec, "electronic assignment records of the U.S. Patent and Trademark Office reflect that the assignment[s] for the [ReadyVote patents] transferring ownership from Gary V. Abel to Plaintiff C.R. Daniels, Inc. were executed by the [sic] Mr. Abel on September

---

[3] Plaintiffs appended to their Complaint copies of all six patents.  Hereinafter, these patents shall be referred to collectively as "the ReadyVote patents."

16, 2011," and the records reflect an "assignment of rights to the [ReadyVote patents] to Plaintiff Casto & Harris, Inc. by Mr. Joseph Wilson on September 20, 2011."   Motion Memo at 2. Further, Naztec asserts that the records reflect "that the assignment documents were recorded with the Patent Office on September 21, 2011."   *Id.*   Defendant has appended copies of these records to the Motion, which conform to defendant's assertions.

Plaintiffs appended as Exhibit 2 to their Opposition the "Affidavit Of Gary V. Abel." Exhibit 2 includes "Appendix A," a copy of Abel's employment agreement with C.R. Daniels, dated December 3, 1999.   The text of the employment agreement is discussed, *infra*, at 7. Plaintiffs' Exhibit 2 also includes "Appendix B," which consists of six documents, entitled "Assignment Of Patent Rights," one for each of the ReadyVote patents, signed by Abel on September 16, 2011.

In addition, plaintiffs appended as Exhibit 3 to their Opposition the "Affidavit Of Joseph Wilson." Exhibit 3 includes "Appendix A," a copy of Wilson's employment agreement with Casto & Harris, dated December 12, 2006.   *See* page 8, *infra*.   They also attached "Appendix B," consisting of six documents, entitled "Assignment Of Patent Rights," one for each of the ReadyVote patents, signed by Wilson on September 20, 2011.

Each of the "Assignment Of Patent Rights" documents contains the following language: "Assignor owns, and by this documents assigns to Assignee, all right, title, and interest to the Patent Rights…"   *See* plaintiffs' Exh. 2, App'x B; plaintiffs' Exh. 3, App'x B.

Defendant appended to its Reply, as its Exhibit 2, the applications for the various ReadyVote patents, with the first application in March 2009.   In the applications, Abel and Wilson, as applicants, affirm that they had not "assigned, granted, conveyed or licensed and

[were] under no obligation under contract or law to assign, grant, convey or license, any rights in the invention[s]…."

 Additional facts will be discussed below.

## Standard of Review

 "It is well established that before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown,* 462 F.3d 312, 316 (4th Cir. 2006). Fed. R. Civ. P. 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. *See Khoury v. Meserve,* 628 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd,* 85 F. App'x 960 (4th Cir. 2004). "[S]tanding…is generally associated with Civil Procedure Rule 12(b)(1) pertaining to subject matter jurisdiction." *CGM, LLC v. BellSouth Telecomms., Inc.,* 664 F.3d 46, 52 (4th Cir. 2011). "[D]efendants may aptly challenge [standing] by a motion to dismiss for lack of jurisdiction over the subject matter, pursuant to Federal Rule of Civil Procedure 12(b)(1)." *Miller v. Pac. Shore Funding,* 224 F.Supp.2d 977, 994 (D. Md. 2002) (citing *Marshall v. Meadows,* 105 F.3d 904, 905–06 (4th Cir.1997)). "Under Rule 12(b)(1), if a party lacks standing the court automatically lacks subject matter jurisdiction." *Casey v. Litton Loan Servicing LP*, No. RDB–11–0787, 2012 WL 502886, *2 (D. Md. Feb. 14, 2012). *See also McInnes v. Lord Baltimore Emp. Ret. Income Account Plan*, No. JKB–11–2286, __ F.Supp.2d __, 2011 WL 5505392, *2 (D. Md. Nov. 10, 2011) (same); *Knowledge Boost, LLC v. SLC California, LLC*, No. WDQ-09-0936, 2009 WL 3379269, *2 (D. Md. Oct. 16, 2009) (same).

 "[A] motion to dismiss under Rule 12(b)(1) is nonwaivable and may be brought at any time-even on appeal-regardless of whether a litigant raised the issue in an initial pleading." *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.,* 471 F.3d 544, 548 (4th Cir. 2006); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the

court must dismiss the action.").  Once a challenge is made to subject matter jurisdiction, the plaintiff bears the burden of proving that the court has subject matter jurisdiction.  *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.,* 166 F.3d 642, 647 (4th Cir.1999); *see also Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Khoury,* 268 F. Supp. 2d at 606.

In ruling on a motion under Fed. R. Civ. P. 12(b)(1), the court "should 'regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Ferdinand–Davenport,* 742 F. Supp. 2d at 777 (quoting *Evans,* 166 F.3d at 647); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991), *cert. denied,* 503 U.S. 984 (1992).  The court should grant a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans,* 166 F.3d at 647.

## Discussion

As noted, when plaintiffs filed suit on June 13, 2011, they averred that the rights to the ReadyVote patents had been assigned to plaintiffs C.R. Daniels and Casto & Harris.  But, according to the records submitted by the defense, it was not until September 2011 that the patents were assigned to plaintiffs.  Naztec asserts: "[W]here standing to sue for patent infringement depends on a written instrument, as here, 'it must be executed before the filing of the complaint.'"  Motion Memo at 4 (citation omitted).  Naztec adds: "Here, the legal title to the

patent[s] had not been assigned to Plaintiffs when the lawsuit began, a critical requirement of Federal Circuit law." *Id.*[4]

Plaintiffs dispute defendant's assertion that plaintiffs lack standing, advancing three arguments.  I shall discuss each in turn.

## I. Legal Title

Plaintiffs insist that "both inventors[, Abel and Wilson,] had already validly assigned the patents to the Plaintiffs well before suit was filed."  Opposition at 2.[5]  Plaintiffs state: "[L]egal title to the [ReadyVote patents] [was] transferred to the Plaintiffs from the inventors pursuant to written employment agreements that each inventor had with his respective employer (the Plaintiffs)." *Id.*

Abel's employment agreement with C.R. Daniels, dated December 3, 1999, states:

---

[4] "[B]ecause the issue here is intimately related to substantive patent law," the law of the Federal Circuit shall be applied. *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed. Cir. 1994).  The parties do not dispute that Federal Circuit precedent should govern the evaluation of standing in this case.

[5] Plaintiffs complain vigorously that the Motion was "filed prematurely without proper discovery and solely for strategic purposes." *Id.* at 1-2.  They assert, *id.* at 2:

> The current Motion is nothing more than a thinly veiled attempt to circumvent this Court's prior ruling that it has personal jurisdiction over Naztec.  Concurrent with the filing of this [M]otion, Naztec has filed suit for declaratory judgment in the District Court for the Southern District of Florida in an apparent attempt to have the case proceed there.

A copy of the suit filed by Naztec in the United States District Court for the Southern District of Florida is appended to the Opposition as plaintiffs' Exhibit 1.

Defendant describes plaintiff's argument as "nothing more than empty rhetoric, serving as diversion and smokescreen to try to hide [plaintiffs'] fatal mistake of forgetting to actually assign the patents…before rushing off to court."  Reply at 16.  Defendant concedes, however, that it "would prefer to have the dispute litigated in its convenient home forum rather than in Maryland."  "Accordingly," explains defendant, "it has initiated a Declaratory Judgment Proceeding in U.S. District Court for the Southern District of Florida and has asked the Florida court to find that the accused products do not infringe any of Plaintiffs' patents." *Id.* at 17.

…I hereby agree that without further consideration to me any inventions or improvements that I may conceive, make, invent or suggest during my employment by [C.R. Daniels]…shall become the absolute property of [C.R. Daniels], and I will, at any time at the request of [C.R. Daniels]…execute any patent papers covering such inventions or improvements as well as any papers that [C.R. Daniels] may consider necessary or helpful in the prosecution of applications for patent thereon and which may relate to any litigation or controversy in connection therewith….

*See* plaintiffs' Exh. 2, App'x A.

With respect to his employment agreement, Abel avers in his Affidavit (plaintiffs' Exhibit 2): "These words reflect my personal intention not merely to pledge an act, but rather to act, by immediately transferring full lawful title for my future inventions to C.R. Daniels. Likewise, it was my intention as President of C.R. Daniels to immediately vest full lawful title to future inventions in C.R. Daniels." Plaintiffs' Exh. 2, Abel Aff. ¶ 6. He continues, *id.* ¶ 11: "…I intended and fully consider this language…to automatically assign such rights by operation of law and thereby vest full ownership of my inventions in C.R. Daniels." With respect to the "Assignment Of Patent Rights" signed on September 16, 2011, Abel explains, *id.* ¶ 12: "The subsequent assignment[, Appendix B,] that I signed after commencement of this lawsuit was for recordation purposes at the United States Patent and Trademark Office, at the bequest of my attorney, such being necessary to perfect C.R. Daniels' title in the [ReadyVote patents] as against subsequent third party licensees or purchasers."

Wilson's employment agreement with Casto & Harris, dated December 12, 2006, includes a clause that is virtually identical to that found in Abel's employment agreement with C.R. Daniels.[6]  And, in language virtually the same as Abel's, Wilson avers in his Affidavit that

---

[6] Wilson's employment agreement states, in part:

…I hereby agree that without further consideration to me any inventions or improvements that I may conceive, make, invent or suggest during my employment by [Casto & Harris]…shall become the absolute property of [Casto

his understanding with respect to that clause mirrored Abel's understanding.  Wilson states: "These words reflect my personal intention not merely to promise to assign, but rather to assign, by immediately transferring full lawful title for my future inventions to Casto & Harris." Plaintiffs' Exh. 3, Wilson Aff. ¶ 6.  He continues, *id.* ¶ 10: "I intended and fully consider this language…to automatically assign such rights by operation of law and thereby vest full ownership of my inventions in Casto & Harris."  And, with respect to the "Assignment of Patent Rights" signed on September 20, 2011, Wilson adds, *id.* ¶ 11: "The subsequent assignment [Appendix B] that I signed after commencement of this lawsuit was for recordation purposes at the United States Patent and Trademark Office, at the bequest of my attorney, such being necessary to perfect Casto & Harris' title in the [ReadyVote patents] as against subsequent third party licensees or purchasers."

Plaintiffs assert that the aforementioned clauses in the respective employment agreements of Abel and Wilson constitute valid assignments.   In their Opposition, at 4, they posit: "Assignment of patents for existing and yet to be conceived inventions are commonly assigned by operation of law under written employment contracts between employee-inventors and the companies for which they work."   According to plaintiffs, "it is well-settled that, when an employment contract expressly grants rights in future inventions, no further act is required once the invention comes into being, and the transfer of title occurs by operation of law."  *Id.* at 5 (citing *DDB Technologies, LLC v. MLB Advanced Media, L.P.,* 517 F.3d 1284 (Fed. Cir. 2008)).

---

& Harris], and I will, at any time at the request of [Casto & Harris]…execute any patent papers covering such inventions or improvements as well as any papers that [Casto & Harris] [sic] for patent thereon and which may relate to any litigation or controversy in connection therewith….

*See* plaintiffs' Exh. 3, App'x A.

Therefore, plaintiffs insist that they held legal title to the ReadyVote patents at the time suit was instituted, and they thus had standing to sue for the infringement of those patents.

In contrast, defendant argues that the employment agreements do not constitute valid assignments because they lack "language that expressly grants rights in a future interest" or "reflect[s] a present assignment." Reply at 4. Put another way, defendant contends that the employment agreements "do not contemplate or reflect an *express present transfer of future rights or the express grant of future rights* to the company." *Id.* at 4-5 (emphasis in original). Rather, they merely reflect "that all inventions shall become the property" of C.R. Daniels and/or Casto & Harris, but discuss "neither the timing nor manner of the transfer." *Id.* at 5. According to Defendant, "[c]ontracts that merely obligate the inventor to grant rights in the future" do not by themselves "'vest *legal* title to patents on the inventions in the promisee,'" but rather only "'vest the promisee with *equitable* rights in those inventions once made.'" *Id.* at 4 (quoting *Arachnid, Inc. v. Merit Industries, Inc.,* 939 F.2d 1574, 1581 (Fed. Cir. 1991) (emphasis in *Arachnid*)).

Defendant also points to the fact that Abel and Wilson "specifically represented and warranted that they owned title to the [ReadyVote patents] when they executed the September 2011 assignments years after the execution date of" the employment agreements each had with his respective employer. Reply at 7. And, defendant has appended records to its Reply, purporting to show that, subsequent to the execution of Abel's employment agreement, Abel assigned other patents he held to third parties.[7] Naztec insists that "[t]he Employment Agreements cannot automatically vest legal title to all inventions conceived while employed by

---

[7] Defendant's Exhibit 1 consists of copies of the 2008 assignments to "Icon Outdoors, Inc." ("Icon") of two patents issued to Abel as inventor in 2003 and 2004 for "collapsible decoy bag[s]." Abel was designated as the assignor, and Icon was the assignee.

C.R. Daniels to C.R. Daniels as Plaintiffs argue, because Mr. Abel has transferred legal title to other inventions made during his employment…to other legal entities." *Id.* at 8.  Defendant continues: "[U]nder Plaintiffs' current theory, Mr. Abel would have had nothing to assign because legal title automatically passed to C.R. Daniels, Inc." *Id.* at 16.

## II.  Equitable Title

Alternatively, plaintiffs assert that "the employment agreements and the relationship between the inventors and the Plaintiffs effectively vested equitable title in the Plaintiffs such that they had standing to seek equitable relief at the time suit was filed."  Opposition at 2.  They note that "[t]he Federal Circuit and federal district courts have long recognized that a party may have equitable title in a patent," and claim that "a party with equitable title to a patent has standing to sue in a federal district court for equitable relief."  Opposition at 10 (citing *Arachnid, supra,* 939 F.2d at 1580) ("[A] federal district court has jurisdiction to determine a 'claim for infringement,' asserted by an adjudged equitable title holder, as a prerequisite to awarding *equitable* relief for that infringement") (emphasis in original)).

Plaintiffs maintain that "district courts have uniformly held that an equitable title holder has standing to sue for equitable relief even if it has also asserted a claim for money damages." Opposition at 11 n. 4 (citing *J & J Manufacturing, Inc. v. Logan,* 24 F. Supp. 2d 692, 700 (E.D. Tex. 1998); *Pipe Liners, Inc. v. American Pipe & Plastics, Inc.*, 893 F. Supp. 704, 706 (S.D. Tex. 1995); *University of Colorado Foundation, Inc. v. American Cyanamid,* 880 F. Supp. 1387, 1397 (D. Colo. 1995)).

Defendant counters: "When a plaintiff sues for money damages and equitable relief, the action is treated as one 'at law.'"  Motion Memo at 6 (quoting *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 309 n. 6 (D. Del. 1995)).  According to defendant,

"equitable ownership [cannot] provide standing for a party that has sued for money damages and equitable relief."   Motion Memo at 6 (citing *Procter & Gamble*, 917 F. Supp. at 309; *Dynamic Mfg. Inc. v. Craze*, 46 U.S.P.Q.2d 1548, 1553 (E.D. Va. 1998)).   In defendant's view, "because Plaintiffs' complaint seeks damages, this avenue of relief is unavailable."   Reply at 13. Defendant concedes, however, that, "if the remedy sought by a Plaintiff is purely equitable in nature, courts have recognized that the exercise of jurisdiction based upon equitable title is permitted."   *Id.* at 14.

### III.  Public Policy

Plaintiffs maintain that "public policy . . . weighs against dismissal."   Opposition at 2. They assert: "It is undisputed that Plaintiffs now have full legal title to sue for infringement, including past infringement; thus, a dismissal of this action would exalt form over substance, waste time and resources and allow Naztec to improperly alter the forum for this case."   *Id.* Plaintiffs cite two cases, *Gipson v. Mattox,* 511 F. Supp. 2d 1182 (S.D. Ala. 2007), and *Bushnell, Inc. v. Brunton, Co.,* 659 F. Supp. 2d 1150 (D. Kan. 2009), for the proposition that a court may, for reasons of efficiency and judicial economy, hear a case in which a defective assignment was perfected after suit was filed, if the plaintiff has secured all rights to sue on a patent.   Opposition at 12-13.

Defendant distinguishes *Gipson* and *Bushnell,* and claims that "[p]ublic [p]olicy [c]onsiderations *[s]upport* [d]ismissal."   Reply at 15 (emphasis added).   In its view, "dismissal would encourage potential litigants to secure legal title to inventions before initiation of suit to avoid the very situation faced by the court and send a clear message to Plaintiffs to ensure they can properly invoke jurisdiction before filing their Complaints."   *Id.*

*IV. Analysis*

"The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the *legal title* to the patent *during the time of the infringement.*"  *Arachnid, supra*, 939 F.2d at 1579 (emphasis in original)).  And, "in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit.*"  *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003).  *Accord Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010) ("A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit….[W]e have held that in a patent infringement action, 'the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit' to assert standing.") (internal citations omitted).

A party claiming patent infringement sometimes bases the claim of legal title to the patent on a  contract with the inventor that provided for the automatic assignment of the inventor's future creations.  Ordinarily, contracts are interpreted under state law.  But, the question of whether a patent assignment clause constitutes an automatic assignment, so as to pass legal title, or merely an obligation to assign in the future, so as to pass equitable title, is "intimately bound up with the question of standing in patent cases."  *DDB Technologies*, *supra*, 517 F.3d at 1290.  Therefore, the Federal Circuit has "treated [this issue] as a matter of federal law," *id*., articulating a basic framework for assessing whether an agreement automatically passes legal title to the purported assignee, such that the assignee has standing to sue for infringement.  The *DDB Technologies* Court explained: "If the contract expressly grants rights in future inventions, 'no further act [is] required once an invention [comes] into being,' and 'the

transfer of title [occurs] by operation of law.'"   *Id.* (citation omitted) (alterations in *DDB Technologies*).

Distinguishing agreements that constitute actual, effective assignments from those that do not seems to hinge on fine semantic distinctions.  *See Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems*, __ U.S. __, 131 S.Ct. 2188, 2203 (2011) (Breyer, J., dissenting) (referring to this area of law as "a technical drafting trap for the unwary").  The *DDB Technologies* Court observed: "[W]e have held that whether an assignment of patent rights in an agreement is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language."  517 F.3d at 1290.  *See also Abraxis,* 625 F.3d at 1364.

The seminal case in this area is *FilmTec Corp. v. Allied-Signal Inc.,* 939 F.2d 1568 (Fed. Cir.1991).   In that case, inventor John Cadotte filed a patent application with respect to a "reverse osmosis membrane."  *Id.* at 1569-70.  He "assigned his rights in the application and any subsequently issuing patent" to FilmTec Corp. ("FilmTec"), a company he helped found.  *Id.* at 1570.  The assignment was  recorded in the United States Patent and Trademark Office.  *Id.* Thereafter, Allied-Signal Inc. and UOP Inc. ("Allied") manufactured a reverse osmosis membrane, prompting FilmTec to file suit against Allied for infringement.  *Id.*

Before founding FilmTec, Cadotte worked for the Midwest Research Institute ("MRI"), a non-profit research institute, pursuant to a contract with the United States government (the "Government") for the study of "In Situ–Formed Condensation Polymers for Reverse Osmosis Membranes."  *Id.*  The contract provided that MRI "agrees to grant and does hereby grant to the Government the full and entire domestic right, title and interest in [any invention, discovery, improvement or development (whether or not patentable) made in the course of or under this

contract or any subcontract (of any tier) thereunder]." *Id.* (alteration in original). Allied insisted that, if the invention was conceived of while Cadotte was at MRI, then, pursuant to the contract, legal ownership of the patent had vested in the Government. *Id.* at 1571. The trial court issued a preliminary injunction enjoining Allied from infringement. *Id*. at 1570.

On appeal, Allied argued that FilmTec did not hold legal title to the patent, and thus could not sue for its infringement. *Id*. The Federal Circuit said: "If an assignment of rights in an invention is made prior to the existence of the invention, this may be viewed as an assignment of an expectant interest.[ ]" *Id.* at 1572. And, "[a]n assignment of an expectant interest can be a valid assignment." *Id*. (citation omitted). But, it would vest in the assignee "at most an equitable title." *Id.* (citation omitted). Legal title would vest in the assignee, however, "[o]nce the invention is made and an application for patent is filed." *Id*. At that point, "the assignor-inventor would have nothing remaining to assign." *Id*. The Court concluded, *id.*:

> [I]f Cadotte granted MRI rights in inventions made during his employ, and if the subject matter of [the patent at issue] was invented by Cadotte during his employ with MRI, then Cadotte had nothing to give to FilmTec and his purported assignment to FilmTec is a nullity. Thus, FilmTec would lack both title to [the patent at issue] and standing to bring the present action.

The Court continued, *id*. at 1573:

> [T]he contract between MRI and the Government did not merely obligate MRI to grant future rights, but expressly granted to the Government MRI's rights in any future invention. Ordinarily, no further act would be required once an invention came into being; the transfer of title would occur by operation of law.

The Court was unsure, however, whether there was a contract provision between Cadotte and MRI that mirrored the contract provision between MRI and the Government, and whether the invention was made during Cadotte's employment with MRI. *Id*. Because the Court was unable to determine who held legal title to the invention at the relevant time, it vacated the preliminary injunction and remanded for further proceedings. *Id*. at 1573-74.

The Court's reasoning as to the effect of the contractual provision between MRI and the Government has formed the backbone of cases like the one at bar, in which legal ownership of a patent is said to have arisen from a contractual obligation with the inventor.  The so-called "*FilmTec* rule" provides that, if the provision at issue "did not merely obligate [the inventor] to grant future rights, but expressly granted…rights in any future invention" then "no further act would be required once an invention came into being; the transfer of title would occur by operation of law."  *Id.* at 1573.

*Arachnid, supra,* 939 F.2d 1574, is instructive.  In 1980, Arachnid, Inc. ("Arachnid"), an electronic dart game manufacturer, entered into an agreement with Industrial Design Electronic Associates ("IDEA"), by which IDEA was to provide consulting services to Arachnid.  *Id.* at 1576.  The consulting agreement provided: "Any inventions conceived by IDEA or its employees…in the course of the project covered by this agreement, shall be the property of CLIENT [Arachnid], and all rights thereto *will be assigned* by IDEA…to CLIENT."  *Id.* (alterations and emphasis in original).  In 1982, shortly after termination of the consulting agreement, IDEA engineers applied for a patent for a "dual-microprocessor feature," which eventually matured into the disputed patent.  *Id.*  The inventors assigned the patent to IDEA in 1982, rather than to Arachnid, and the patent was issued to IDEA in 1985.  *Id.*  Arachnid sued IDEA for patent infringement, and a jury found in its favor in 1987.  *Id.*

In the meantime, in 1985, prior to the verdict in Arachnid's favor, IDEA had granted a nonexclusive license to the patent to Merit Industries, Inc. ("Merit"), which manufactured and sold several hundred games utilizing the dual-microprocessor feature of the patent.  *Id.* at 1576-77.  As a result, in 1986, Arachnid also sued Merit for patent infringement, and ultimately prevailed at trial.  *Id.* at 1577.  On appeal, Merit argued that Arachnid lacked standing to recover

for infringement, because Arachnid did not have legal title to the patent at the time Merit sold the allegedly infringing games. *Id.* at 1578.

The Federal Circuit agreed with Merit, concluding that Arachnid did not have legal title to the patent during 1985 - 1986, and thus lacked standing to sue Merit for infringement.   It regarded as "untenable Arachnid's position that when IDEA signed the [consulting] agreement [with Arachnid] in 1980 it automatically divested itself of any and all rights to inventions that might be developed under the agreement or patents to issue thereon." *Id.* at 1580.   The Court reasoned, *id.* at 1580-81 (emphasis in original):

> [T]he Arachnid/IDEA consulting agreement was an *agreement to assign,* not an assignment.   Its provision that all rights to inventions developed during the consulting period 'will be assigned' by IDEA to Arachnid does not rise to the level of a present assignment of an existing invention, effective to transfer all legal and equitable rights therein to Arachnid and extinguish any rights of IDEA. Nor does the provision amount to a present assignment of an expectant interest.   *See Filmtec Corp. v. Allied-Signal Inc.,* 939 F.2d 1568, 1572 (1991). Although an agreement to assign in the future inventions not yet developed may vest the promisee with *equitable* rights in those inventions once made, such an agreement does not by itself vest *legal* title to patents on the inventions in the promisee[.]

In contrast, in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000), the Federal Circuit determined that the contract at issue *did* vest legal title to a patent in the party seeking damages for infringement.   Speedplay, Inc. ("Speedplay") filed suit against Bebop, Inc. ("Bebop") with respect to a certain design of bicycle pedal that Bebop marketed, which Speedplay claimed infringed on patents it held.   *Id.* at 1249.   On appeal, the Court considered whether Speedplay had standing to sue on the patent at issue.   *Id.*

Speedplay's founder, CEO, and employee, Byrne, was the inventor of the bicycle pedal, for which he was issued one patent in 1992 (the '778 patent) and another (the '009 patent) soon after the '778 patent entered the market.   *Id.*   In April 1994, after suit was filed, Byrne submitted

another patent application, and a third patent (the '894 patent) was issued. *Id*. As a result, Speedplay amended its suit to allege infringement of that patent as well. *Id*.

"Speedplay trace[d] its rights in the '894 patent to [a] Confidentiality and Inventions Agreement (CIA) entered into on September 17, 1992, by Bryne as employee and Speedplay as employer." *Id*. at 1253. Speedplay claimed that, based on the CIA with Byrne, it had automatically obtained title to the '894 patent. *Id*. Bebop maintained that the CIA was insufficient to confer legal title in Speedyplay, because it was merely a "promise to assign a future invention." *Id*.

Accordingly, the precise text of the CIA was in issue. The CIA stated that "any intellectual property conceived or developed by Bryne within the scope of his employment and during the term of the agreement [with Speedplay]…shall belong exclusively to [Speedplay] and [Bryne] hereby conveys, transfers and assigns to [Speedplay]…all right, title and interest in and to Inventions." *Id*.

Based on the language of the CIA, the Court determined that Speedplay automatically obtained title to the disputed patents, because the CIA was not "merely a 'promise to assign a future invention.'" *Id*. Distinguishing the "will be assigned" language in the *Arachnid* agreement from the text of the CIA, the Court observed:

> The language in the CIA…differs significantly from the language at issue in *Arachnid*. It provides that inventions 'shall belong' to Speedplay, and that Bryne 'hereby conveys, transfers and assigns' the inventions to Speedplay. Therefore, this case is not controlled by *Arachnid,* but by [*FilmTec*], in which the contractor agreed 'to grant and does hereby grant' to the client the rights and title to any invention, whether patentable or not.

*Id.* (some internal quotation marks omitted).

In reaching its conclusion, the Court relied on *FilmTec* for the proposition that "'no further act would be required once an invention came into being; the transfer of title would occur

by operation of law.'" *Id.* (quoting *FilmTec, supra*, 939 F.2d at 1568).  In its view, the language of present assignment in the CIA distinguished it from the agreement at issue in *Arachnid*, and served automatically to vest in Speedplay legal title to the patent, such that it could maintain a suit for infringement against Bebop.

In this case, as noted, Abel's employment agreement with C. R. Daniels, and Wilson's employment agreement with Casto & Harris, both stated that "*without further consideration* to [the inventor] any inventions or improvements that [he] may conceive, make, invent or suggest during [his] employment by [C.R. Daniels or Casto & Harris]…*shall become* the absolute property of [C.R. Daniels or Casto & Harris]." *See* plaintiffs' Exh. 2, App'x A; plaintiff's Exh. 3, App'x A (emphasis added).  The employment agreements further obligated the inventors, "at any time at the request of [C.R. Daniels or Casto & Harris]…[to] execute any patent papers covering such inventions or improvements as well as any papers that [C.R. Daniels or Casto & Harris] may consider necessary or helpful in the prosecution of applications for patent thereon and which may relate to any litigation or controversy in connection therewith…." *Id.*

Arguably, the employment agreements lack "words of present conveyance." *Freedom Wireless, Inc. v. Boston Commc'ns Group, Inc.*, 220 F. Supp. 2d 16, 20 (D. Mass. 2002).  Abel and Wilson expressly said that they "hereby agree" that their future inventions "shall become" the property of their employers.  But, because the parties were addressing the ownership of intellectual property that had not yet come into being, the use of some seemingly future-oriented language was understandable.  The crucial consideration turns on whether assignment was "expressly undertake[n]…at the time of the agreement," or whether it was left "to some future date." *Gellman v. Telular Corp.*, 449 F. App'x 941, 944 (Fed. Cir. 2011).  In my view, the phrase "without further consideration" is of key importance in the analysis, as it indicates that the

agreements contemplated that "no further act would be required once an invention came into being; the transfer of title would occur by operation of law." *FilmTec,* 939 F.2d at 1568.

Moreover, nothing in the text of the employment agreements contradicts the conclusion that, by use of the phrase "without further consideration," the parties contemplated that Abel and Wilson's inventions would automatically become the property of their employers upon invention.[8]   As plaintiffs observe, "[c]onspicuously absent from the Abel and Wilson Employment Agreements is any language indicating that some other act had to be performed for the assignments to be complete."  Opposition at 7.  *Compare Abraxis, supra,* 625 F.3d at 1365 (finding insufficient to constitute a present assignment contractual language that obligated purported seller of the patents to "[t]ransfer to the Purchaser, and the Purchaser [to] purchase and accept from the Seller…all of the right, title and interests of the Seller" in the patents at issue," because "[t]he actual transfer of the patents was to occur by means of a separate 'IP Assignment Agreement' in the form to be mutually agreed upon by the parties prior to a [later, stipulated] closing date.").  In my view, to find dispositive the absence of words such as "hereby grant" is to exalt form over substance, and to validate Justice Breyer's criticism in his dissent in *Roche Molecular*, in which he said that "the *FilmTec* rule" was a "drafting trap for the unwary" that "the cognoscenti may be able to meet…in future contracts simply by copying the precise words blessed by the Federal Circuit…."  131 S.Ct. at 2203.

Nor is it fatal that the employment agreements required Abel and Wilson, upon the request of their respective companies, to "execute any patent papers…as well as any papers that

---

[8] Plaintiffs argue that "the Abel and Wilson Affidavits make clear that the inventors understood the language of the agreement to be a present assignment of future interests." Opposition at 7. Although the affidavits surely bolster this view, the affidavits are, in my view, of little evidentiary value; they are inherently self-serving and, in any event, I look to the contractual language itself, not parol evidence.

[C.R. Daniels or Casto & Harris] may consider necessary or helpful in the prosecution of applications for patent thereon and which may relate to any litigation or controversy in connection therewith…."  *See* plaintiffs' Exh. 2, App'x A; plaintiff's Exh. 3, App'x A.  This language merely required the inventors to provide assurances that they would assist their employers with efforts to patent their future inventions.  It does not indicate that the immediate assignment contemplated by the employment agreements was invalid or incomplete.

Comparison with *Gellman*, *supra*, 449 F. App'x 941, is instructive.  In that case, Gellman brought suit for infringement of a patent on which her late husband, Lebowitz, was a named co-inventor.  *Id.* at 942.  The district court dismissed the suit, without prejudice, for lack of standing, as another co-inventor, Seivert, had not joined the suit.  *Id.*  Gellman argued that Seivert was Lebowitz's employee, and claimed that "the terms of his employment included full transfer of rights to any resulting inventions."  *Id.* at 943.  Although Gellman was "unable to produce any signed writing describing the terms of this employment," she offered "a document bearing the title 'AGREEMENT FOR CONSULTING SERVICES,' unsigned but purporting to set up Mr. Seivert as a consultant to a company that Mr. Lebowitz operated called Cellular Alarm Systems, Inc. ('Cellular Alarm')."  *Id.*  The agreement stated, *id.* at 943-44 (alterations in original):

> [A]ny and all ideas, discoveries, inventions, [etc.]...developed, prepared, conceived, made, discovered or suggested by [Mr. Seivert] when performing services pursuant to this Agreement...shall be and remain the exclusive property of Cellular Alarm.  [Mr. Seivert] agrees to execute any and all assignments or other transfer documents which are necessary, in the sole opinion of Cellular Alarm, to vest in Cellular Alarm all right, title, and interest in such Work Products.

Although the Court found that "the lack of a signed instrument" was "troubling," it was "not fully dispositive."  *Id.* at 994.  Rather, it was the language of the consulting agreement that was not "sufficient to confer standing."  *Id.*  The Court reasoned that Seivert's agreement to

execute any assignments or transfer documents would be "surplusage without relevant meaning" if the agreement had served to convey full title to Lebowitz.  *Id*.  It stated, *id.* at 944-45 (emphasis added):

> Rather than expressly undertake assignment at signing, [the agreement] expressly delays assignment to some future date, when Mr. Seivert would 'execute any and all *assignments* or other transfer documents' necessary to convey his rights to Cellular Alarm.  The district court was therefore correct in its conclusion that the [agreement], if enforceable as a contract, could do no more than create an equitable claim….

Notably, in the case at bar, the employment agreements did not refer to the future execution of *assignments*, but to the future execution of "patent papers" and "papers that [C.R. Daniels or Casto & Harris] may consider necessary or helpful in the prosecution of applications for patent thereon and which may relate to any litigation or controversy in connection therewith…."  Clearly, the employment agreements merely contemplated the performance of ministerial tasks necessary to obtain patents.

Moreover, the Federal Circuit has found that even an express reference to the future execution of an assignment does not preclude a finding of a present assignment when the contractual language otherwise clearly constitutes an express, immediate assignment.  *DDB Technologies*, *supra,* 517 F.3d 1284, is pertinent.

DDB Technologies, LLC ("DDB") sued MLB Advanced Media, LP ("MLBAM") for infringement of patents relating to a computer simulation method.  *Id.* at 1286.  The patents at issue had been issued to two inventors, the brothers David and Daniel Barstow.  *Id.*  The Barstows later assigned the patents to DDB, a company they formed "to commercialize and further develop their inventions."  *Id.*  DDB's suit against MLBAM was dismissed for lack of subject matter jurisdiction, after the trial court determined that David Barstow had previously assigned his interest in the patents to his former employer, Schlumberger Technology

Corporation ("Schlumberger"), leaving DDB without legal title to the patents or standing to sue for infringement. *Id.*[9]

The agreement between David Barstow and Schlumberger included the following provisions, *id.* at 1287 (emphasis added):

> 3. Employee shall promptly furnish to Company a complete record of any and all technological ideas, inventions and improvements, whether patentable or not, which he, solely or jointly, may conceive, make or first disclose during the period of his employment with [Schlumberger].
> 4. Employee agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements coming within the scope of Paragraph 3:
>    a) which relate in any way to the business or activities of [Schlumberger], or
>    b) which are suggested by or result from any task or work of Employee for [Schlumberger], or
>    c) which relate in any way to the business or activities of Affiliates of [Schlumberger],
> together with any and all domestic and foreign patent rights in such ideas, inventions and improvements. *Employee agrees to execute specific assignments* and do anything else properly requested by [Schlumberger], at any time during or after employment with [Schlumberger], to secure such rights.

DDB contended that "the employment agreement itself contemplated an additional act of assignment," as the agreement required Barstow to "execute specific assignments and do anything else properly requested by Company, at any time during or after employment with Company, to secure such rights." *Id.* 1290 n.3. The Federal Circuit disagreed, concluding that the language "'agrees to *and does hereby grant and assign*'…was not merely an agreement to assign, but an express assignment of rights in future inventions." *Id.* at 1290 (emphasis in original). It held that, pursuant to the employment agreement, patent rights were "automatically assigned to Schlumberger by operation of law with no further act required on the part of the company." *Id.* In light of the language of express assignment, the Court found that the provision

---

[9] It was undisputed that Daniel Barstow's interest had been properly assigned to DDB. *Id.* at 1286 n.1.

that Barstow later "execute specific assignments" was of no import.   It reasoned: "We see nothing in this clause that conflicts with the clear language of the present, automatic assignment provision in the agreement." *Id.* at 1290 n.3.

Here, as noted, the "Assignment Of Patent Rights" documents executed in 2011 each stated: "Assignor owns, and by this documents assigns to Assignee, all right, title, and interest to the Patent Rights…" *See* plaintiffs' Exh. 2, App'x B; plaintiffs' Exh. 3, App'x B.   Although Naztec argues that the employment agreements did not constitute valid assignments because Abel and Wilson "specifically represented and warranted that they owned title to the [ReadyVote patents] when they executed the September 2011 assignments….," Reply at 7, the *DDB Technologies* Court made clear that the fact of later "assignment" did not vitiate the earlier transfer of legal title.

*Sims v. Mack Trucks, Inc.,* 407 F.Supp. 742 (E.D. Pa. 1976), which was cited in *Arachnid,* 939 F.2d at 1581, is noteworthy.   In  a contract for the sale of a patent, the seller, R.W. Sims, acting as Trustee for the R.W. Sims Trust, stipulated that he "hereby sells" the patent, and the buyer, Beta Corporation ("Beta"), "hereby purchases." *Id.* at 744.   Sims later attempted to argue that the contract was "merely an agreement to assign the patent and d[id] not constitute an actual transfer of title," because Sims was also required to execute "an assignment of [the patent at issue] within one month following execution of th[e] agreement," which would later be delivered to Beta "for recordation in the United States Patent Office," after Beta "paid in full the unpaid balance of the purchase price." *Id.*   At the time of suit, Beta had not paid the purchase price, and no assignment as contemplated by the contractual provision had been executed. *Id.* Yet, the court concluded that Beta held legal title to the patent.   This precluded Sims from bringing suit against a third party, Mack Trucks, Inc., for infringement of the patent, because it

had transferred the patent to Beta.  The court reasoned that "the failure of [Sims] to execute an assignment to Beta is analogous to a failure to record an assignment in the Patent Office.  Legal title may pass despite the failure to record," and it interpreted the provision "as a mere formality designed to guarantee payment and to facilitate recordation of the assigned patent."  *Id*.

It is true that in the September 2011 assignments, Abel and Wilson purport to have held legal title at that time, whereas now they contend that they were already divested of legal title at that time, because legal title was vested in their employers, pursuant to their employment agreements.  However, as plaintiffs observe, "Recordation of [an] assignment is merely a ministerial act and is not a determination by the [United States Patent and Trademark Office] of the validity or effect of the assignment document."  Opposition at 8.  Rather, it is merely "intended to provide legal notice to the public of the assignment," as "'[a]n assignment, grant, or conveyance shall be void as against any subsequent purchaser or mortgagee for valuable consideration, without notice, unless it is recorded….'"  *Id*. (quoting 35 U.S.C. § 261).  And, as discussed, *supra*, the *DDB Technologies* Court made clear that the fact of a later execution or recordation of "assignment" does not govern whether, based on a prior document, there was an earlier transfer of legal title.  The operative issue is whether, by virtue of an earlier agreement, title automatically passed from inventor to employer by operation of law, leaving no interest in the inventor to assign.

I decline to consider the purported significance of Abel's assignment of the "decoy bags" patents to a third party.  *See, supra,* note *7.  The allegations regarding those patents were raised in defendant's Reply, not the Motion.  "'It is a well settled rule that contentions not raised in the argument section of the *opening brief* are abandoned.'"  *A Helping Hand, LLC v. Baltimore Cnty.,* 515 F.3d 356, 369 (4th Cir. 2008) (quoting *United States v. Al-Hamdi,* 356 F.3d 564, 571

n.8 (4th Cir. 2004) (emphasis added)).  *See also United States Secs. and Exch. Comm'n v. Pirate Investor LLC*, 580 F.3d 233, 255 n.23 (4th Cir. 2009) ("Ordinarily we do not consider arguments raised for the first time in a reply brief") (*citing Helping Hand, supra,* 515 F.3d at 369); *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered").  In any event, it is not difficult to conceptualize a number of situations in which Abel could have assigned the decoy bags patents, without necessitating the conclusion that the employment agreement was not a present assignment.

To be sure, it is troubling that, in the applications for the ReadyVote patents, filed beginning in March 2009, Abel and Wilson affirmed that they had not "assigned, granted, conveyed or licensed and [were] under no obligation under contract or law to assign, grant, convey or license, any rights in the invention[s]…."  Defendant's Exhibit 2.  This suggests that they did not regard their earlier employment agreements as controlling.  But, the representations in the application do not dispose of the issue; it is the text of the earlier employment agreements that controls.  Abel and Wilson were bound by their agreements, and their subsequent assertions did not alter their legal obligations.[10]

### Conclusion

In sum, although this is a close issue, I am satisfied that the language in the employment agreements of Abel and Wilson more closely resembles the "does hereby grant" and "hereby conveys, transfers and assigns" language of *FilmTec* and *Speedplay,* respectively, rather than the "will be assigned" language of *Arachnid*.  The employment agreements therefore constitute valid

---

[10] Moreover, at the very least, Abel and Wilson had agreed to prospective assignments in their employment agreements, as defendant concedes.  Yet, they asserted to the contrary in their applications.  The applications are thus of little evidentiary value.

present assignments.[11]   It follows that, at the time this suit was commenced, plaintiffs had legal

title to the ReadyVote patents, and standing to prosecute the suit for infringement.   For the

foregoing reasons, I will deny defendant's motion to dismiss for lack of subject matter

jurisdiction.   A separate Order, consistent with this Memorandum Opinion, follows.


Date: April 13, 2012                                                _____/s/_____
                                                                              Ellen Lipton Hollander
                                                                              United States District Judge

---

[11] Having so found, I need not address the parties' arguments, described *supra*, regarding equitable title and public policy.